**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ECOFACTOR, INC., | Civil Action No. 6:20-cv-00075 (ADA) |
| Plaintiff, | |
| v. | **PUBLIC VERSION** |
| GOOGLE LLC, | |
| Defendant. | |

**GOOGLE LLC'S RESPONSE IN OPPOSITION TO ECOFACTOR, INC.'S MOTION
TO EXCLUDE EXPERT OPINIONS OF TODD SCHOETTELKOTTE**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  ARGUMENT ........................................................................................................2

    A.  Mr. Schoettelkotte's reliance on the Trane Agreement and related documentation is proper under Rule 702. .................................................2

        1.  EcoFactor executed an Asset Purchase Agreement with Trane that included rights to the Asserted Patents. ....................................2

        2.  The Trane Agreement is comparable to the license resulting from hypothetical negotiation.............................................................4

    B.  The Trane documents upon which Mr. Schoettelkotte relies were produced in this case and there is no basis for excluding them under Rule 37. .....................7

        1.  Google subpoenaed and deposed Trane in the District Court and ITC matters, and EcoFactor obtained the Trane documents in discovery. ...........................................................................................7

        2.  EcoFactor had the Trane documents and used them to depose Mr. Schoettelkotte...............................................................................9

        3.  The Trane documents were produced in discovery and used by EcoFactor, and EcoFactor cannot identify any prejudice. .........................10

    C.  Mr. Schoettelkotte's reliance on EcoFactor's valuations is proper under Rule 702. ..............................................................................................14

        1.  EcoFactor procured several valuations prior to the hypothetical negotiation...................................................................................14

        2.  EcoFactor's valuations are relevant to the value of EcoFactor's patents. .......................................................................................15

    D.  There is no basis for excluding Mr. Schoettelkotte's reliance on Google's usage data under Rule 702 or Rule 37. ..............................................16

        1.  Mr. Schoettelkotte relied on data related to Nest thermostats' Internet connectivity to rebut EcoFactor's damages opinion. ..................16

        2.  Mr. Schoettelkotte's reliance on the Wi-Fi spreadsheet was reliable, and EcoFactor has identified no prejudice based on its lack of earlier access to the spreadsheet. ..................................................17

1770141

III.    CONCLUSION...................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ART+COM Innovationpool GmbH v. Google Inc.*,
  155 F. Supp. 3d 489 (D. Del. 2016)..........................................................................4

*Blattman v. Siebel*,
  2020 WL 475413 (D. Del. Jan. 29, 2020).........................................................14, 16

*Carucel Invs., L.P. v. Novatel Wireless, Inc.*,
  2017 WL 1215838 (S.D. Cal. Apr. 3, 2017), *aff'd*, 730 F. App'x 938 (Fed. Cir.
  2018) ........................................................................................................................5

*In re Complaint of C.F. Bean L.L.C.*,
  841 F.3d 365 (5th Cir. 2016) .................................................................................13

*Egenera, Inc. v. Cisco Sys., Inc.*,
  -- F. Supp. 3d --, 2021 WL 2582406 (D. Mass. June 23, 2021) ......................15, 16

*Gun Barrell Jacksonville LLC v. Depositors Ins. Co.*,
  2021 WL 5154218 (E.D. Tex. Oct. 9, 2021) .....................................................13, 19

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (2012)...................................................................................................4

*Mformation Techs., Inc. v. Rsch. in Motion Ltd.*,
  2012 WL 2339762 (N.D. Cal. June 7, 2012) .........................................................15

*Parthenon Unified Memory Architecture LLC v. Apple Inc.*,
  2016 WL 7670833 (E.D. Tex. Sept. 21, 2016) ........................................................5

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015)...............................................................................7

*Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*,
  2021 WL 414812 (E.D. Tex. Feb. 5, 2021) ...........................................12, 18, 19

**Rules**

Federal Rule of Civil Procedure 37 ............................................................. *passim*

Federal Rule of Evidence 702.................................................................1, 2, 14, 16

1770141

## I.    INTRODUCTION

In reaching his conclusion as to a reasonable royalty, Google's damages rebuttal expert,

Todd Schoettelkotte, relied upon evidence including EcoFactor's grant of prior licenses to its

patent portfolio (including the patents-in-suit), third-party valuations of EcoFactor's business and

assets, the lack of competition between the parties, the rates paid by Google for comparable

patents, and testimony of Google and EcoFactor personnel.  EcoFactor's motion raises a

hodgepodge of arguments seeking to exclude certain evidence relied upon by Mr. Schoettelkotte

under Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 37.  None of

EcoFactor's arguments has merit.

*First*, EcoFactor seeks to exclude Mr. Schoettelkotte's reliance on EcoFactor's agreement

with Trane U.S., Inc. ("Trane Agreement") as non-comparable to the license produced by a

hypothetical negotiation, despite the fact that the Trane Agreement was negotiated outside of the

litigation context and executed prior to the hypothetical negotiation date.  In effect, EcoFactor

seeks to prevent Mr. Schoettelkotte from relying on the most reliable EcoFactor license in the

record.  *Second*, EcoFactor argues that Mr. Schoettelkotte should not be allowed to rely on

documents produced by Trane related to its license to EcoFactor's patents, despite the fact that

the documents were indisputably in EcoFactor's possession.  EcoFactor's attempt to exclude

these documents has more to do with the documents' contents evidencing the low value Trane

placed on EcoFactor's patents than any purported discovery issue or prejudice to EcoFactor.

*Third*, EcoFactor argues that Mr. Schoettelkotte cannot rely on EcoFactor's corporate valuations.

But such valuations are useful datapoints to assess the value of a company's intellectual

property, and EcoFactor has no support for its position that Mr. Schoettelkotte's reliance on them

is unreliable.  *Fourth*, EcoFactor argues that Mr. Schoettelkotte should not have relied on a

1770141

spreadsheet showing that not all Nest devices are connected to Wi-Fi (which Mr. Schoettelkotte uses to demonstrate that EcoFactor has overstated the royalty base). But EcoFactor never requested such data in discovery, nor can it identify any prejudice from receiving this spreadsheet with Mr. Schoettelkotte's report.

Because EcoFactor offers no legitimate basis for excluding this evidence or Mr. Schoettelkotte's opinions under Rule 702 or Rule 37, its motion should be denied in its entirety.

## II.   ARGUMENT

### A.   Mr. Schoettelkotte's reliance on the Trane Agreement and related documentation is proper under Rule 702.

#### 1.   EcoFactor executed an Asset Purchase Agreement with Trane that included rights to the Asserted Patents.

EcoFactor and Trane, an HVAC provider, entered into the Trane Agreement on February 28, 2019. Mirzaie Decl.,[1] Ex. C. In the Trane Agreement, EcoFactor indicated its " ████████

████████████████████████████████████ related to energy efficiency

and HVAC performance monitoring. *Id.* at EF_0665733. The Trane Agreement included a

████████████████   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████. *Id.* at

EF_0665798-99.[2] The Trane Agreement provided that Trane would pay EcoFactor ████████

in consideration. *Id.* at EF_0665739.

Trane produced several documents that provided context for the Trane Agreement. One

document, for example, indicated that a portion of the ████████ contract price ████

---

[1] Declaration of Reza Mirzaie in Support of EcoFactor's Mot. to Exclude Expert Opinions of Todd Schoettelkotte, ("Mirzaie Decl.").

[2] The '382 patent, which EcoFactor also asserts against Google here, had not yet issued at the



██████████████████████████████████ In that document, dated February 8, 2019—

shortly before the Trane Agreement was executed—Trane stated that it had allocated ██

████████████████████████████████████████. Porto Decl.,[3] Ex. 1.  In

another document, which EcoFactor itself authored and provided to Trane in connection with the

Trane Agreement, EcoFactor stated that its █████████████████████████████

███████████████████ *Id.*, Ex 2 at 2. Trane also produced a February 2019 Trane

presentation that detailed ████████████████████ which stated that in a ██████████

Trane needed to ███████ from EcoFactor a ███████████████████████

████████ *Id.*, Ex. 3 at 17.

In reaching his reasonable royalty opinion, Mr. Schoettelkotte relied on, among other

things, the Trane Agreement, Trane allocation's ██████████████████████████

████████ and EcoFactor's ████████████████████████████████ *Id.*, Ex. 4

¶¶ 184, 190.  In his analysis of the first *Georgia Pacific* factor, which concerns comparable

licenses, Mr. Schoettelkotte considered the Trane Agreement, along with three settlement

agreements in which EcoFactor granted a patent license to other parties it had sued, and which

post-date EcoFactor's filing of this case.  *Id.* ¶¶ 117-131.  Mr. Schoettelkotte considered the

Trane Agreement most relevant to the first factor, given that the Trane Agreement was not a

litigation settlement and ██████████████████████████████████████████

██████████████████████████████████████████████████████████

time of the Trane Agreement.  Nonetheless, ██████████████████████████████

███████████████████████████████████████████████████

████████████████████ *See* Mirzaie Decl., Ex C at EF_0665809.

[3] Declaration of Anna Porto in support of Google's Response in Opp. to Mot. to Exclude Expert
Opinions of Todd Schoettelkotte ("Porto Decl.")

▮▮▮▮▮▮▮  *See id.* ¶ 141.  Mr. Schoettelkotte also noted that the negotiations with Trane

provided insight into the value of EcoFactor's patent portfolio, including the Trane document

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  and EcoFactor's

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Mirzaie Decl., Ex. A ¶ 141.

### 2. The Trane Agreement is comparable to the license resulting from hypothetical negotiation.

EcoFactor attempts to discredit Mr. Schoettelkotte's use of the Trane Agreement by

arguing that the patent license it contained is not comparable because it was part of a broader

business negotiation.  But there is no support for EcoFactor's position.  Indeed, courts have come

to the opposite conclusion, making clear that on the spectrum of relevant licenses, agreements

negotiated outside of the context of litigation—like the Trane Agreement—are often more

reliable than others.  Settlement agreements are thus often presented in contrast to "real-world

licens[es]," like the Trane Agreement.  *ART+COM Innovationpool GmbH v. Google Inc.*, 155 F.

Supp. 3d 489, 512 (D. Del. 2016) (excluding settlement agreements but permitting testimony as

to non-settlement agreements).  Particularly in cases where non-settlement licenses are available,

as they are here, relying on real-world licenses may be preferable to settlement agreements.  In

*LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 77 (2012), for example, the court

rejected an expert's reliance on a settlement agreement, noting that there were several licenses

"which are not settlements of active litigation" that were "far more reliable indicators of what

willing parties would agree to in a hypothetical negotiation."  *Id.* at 78.

The flaws in EcoFactor's argument that a patent license within a business agreement

cannot be used to construct a hypothetical negotiation are even more apparent when one

considers Mr. Schoettelkotte's reliance on the Trane Agreement in context: it is one of numerous

datapoints he relies upon in the *Georgia Pacific* analysis.  Although Mr. Schoettelkotte

4

considered the Trane Agreement as the most relevant license in his analysis of the first *Georgia Pacific* factor, his ultimate conclusion as to the reasonable royalty was informed by significant other evidence, including EcoFactor's valuations (addressed below), the lack of competition between the parties, Google's and EcoFactor's lack of profitability, other licenses, and numerous other factors. *See* Porto Decl., Ex. 4 ¶ 184 (summarizing relevant factors). There is thus no support for EcoFactor's position that Mr. Schoettelkotte's reliance on the Trane Agreement is improper. *See Carucel Invs., L.P. v. Novatel Wireless, Inc.*, 2017 WL 1215838, at *13 (S.D. Cal. Apr. 3, 2017), *aff'd*, 730 F. App'x 938 (Fed. Cir. 2018) (permitting testimony as to non-settlement license where expert had "considered and accounted for . . . economic comparability"); *Parthenon Unified Memory Architecture LLC v. Apple Inc.*, 2016 WL 7670833, at *1 (E.D. Tex. Sept. 21, 2016) (permitting damages expert to "consider a patent purchase agreement to help calculate a reasonable royalty").

EcoFactor also contends that Mr. Schoettelkotte cannot rely on the Trane Agreement because although Trane agreed to pay EcoFactor



*See* Mot.[4] at 2-3. EcoFactor's argument is nonsensical. EcoFactor acknowledges that

with Trane, and EcoFactor concedes that the Agreement

*Id.* at 3.

---

[4] Motion to Exclude Expert Opinions of Todd Schoettelkotte ("Mot."), ECF 117.

1770141

The only support EcoFactor offers is that the Trane Agreement █████████████ ██████████████████████████████████ But the fact that the Trane Agreement defined ███████████████████████████████████████ ███████████████████████████—does not support EcoFactor's nonsensical interpretation that the █████████ contract price must have no relationship ████████████ The more likely explanation is that █████████████████████ ██████████████████████████████," █████████████████ ██████████████████ Contemporaneous documents confirm that ██████████ ██████████████████████████████████████ One Trane document, for example, described ██████████████████████████ ████████████ Porto Decl., Ex. 5 at 8.  And a Trane email sent a few weeks before the Agreement was executed indicated that Trane assigned a value of approximately ████████ to ███████████████ *Id.*, Ex. 1.[5]

At most, EcoFactor's criticism of Mr. Schoettelkotte's use of these documents goes to the weight of the evidence, which does not justify exclusion of his opinions or the evidence he cites in support.  EcoFactor argues, for example, that Trane's █████████████ should be disregarded because it "does not appear in the Trane Agreement" and there "is no evidence that Trane ever shared this email . . . with EcoFactor."  Mot. at 4.  EcoFactor fails to explain, however, why Trane's ███████████████████ must appear in the Trane Agreement itself or be shared with EcoFactor for Mr. Schoettelkotte to consider this document, among

---

[5] Even if one were to credit EcoFactor's interpretation that no part of the █████████ contract price ████████████████████████ that fact would still be relevant to the hypothetical negotiation.  If ██████████████████ ████████ that would certainly bear on the value of these patents and it would still be reasonable for Mr. Schoettelkotte to consider the Trane Agreement.

1770141

others, in reaching his opinion.  EcoFactor also argues that ███████████████████

███████████████████ was "*post hoc*" despite that the assessment was dated 20 days *prior* to

the execution of the Trane Agreement.  *See* Mot. at 6; Porto Dec., Ex. 1.  Finally, EcoFactor

quibbles with Mr. Schoettelkotte's reliance on a Trane presentation that noted Trane had

assumed a patent license ███████████████████ arguing that Mr. Schoettelkotte

lacked sufficient information about the document.  *See* Mot. at 7-8.  But Mr. Schoettelkotte

refers to the ████████ only in rebuttal to the opinion of EcoFactor's damages expert, noting the

discrepancy between Trane's assumed rate of ██████ and the per-unit royalty rate proposed by

EcoFactor's expert.  *See* Porto Decl., Ex. 4 ¶ 85.  And again, EcoFactor's complaint that it did

not approve of this presentation goes to "the weight of the evidence, not its admissibility" and

thus has no bearing on the reliability of Mr. Schoettelkotte's opinion.  *Summit 6, LLC v. Samsung

Elecs. Co*., 802 F.3d 1283, 1296 (Fed. Cir. 2015).  Because Mr. Schoettelkotte's "methodology is

reasonable" and his "evidence [is] sufficiently tied to the facts of the case," any remaining

"inquiry on the correctness of the methodology and of the results produced thereunder belongs to

the factfinder."  *Id.* at 1296.

> **B.      The Trane documents upon which Mr. Schoettelkotte relies were produced
> in this case and there is no basis for excluding them under Rule 37.**
>
> > **1.      Google subpoenaed and deposed Trane in the District Court and ITC
> > matters, and EcoFactor obtained the Trane documents in discovery.**

EcoFactor filed actions against Google in the International Trade Commission ("ITC")

and in the Western District of Texas claiming that Google's Nest products infringed EcoFactor's

patents.  The first case, Investigation No. 337-TA-1185 ("ITC -1185") was filed in October

2019.[6]  While that investigation was pending, in January 2020, EcoFactor filed a complaint against Google (and several other defendants) in the Western District of Texas (the "District Court" case).  Finally, in February 2021, EcoFactor filed a second ITC case, Investigation No. 337-TA-1258 ("ITC -1258"), which is scheduled for a hearing on December 13, 2021.

The three cases substantially overlap in subject matter.  For example, two of the patents asserted against Google in the District Court case claim priority to the same provisional application as several of the patents asserted in ITC -1258.  Given the overlap in the cases, the parties agreed to consolidate and streamline discovery in many instances, including with respect to Trane.  The parties agreed, for example, that "[a] party's documents . . . produced . . . in [ITC -1185] can be used in" the District Court case.   Stipulated Discovery Order, ECF No. 70.  The parties further agreed that EcoFactor documents produced in ITC -1258 would be "deemed produced in Western District of Texas."  Porto Decl., Ex. 6.  Furthermore, source code review was coordinated in the ITC and District Court matters, 30(b)(6) designations were made for both cases together, and *fourteen* depositions were conducted for purposes of both the ITC and District Court matters.  *See id.*, Ex. 7; *id.*, Ex. 8.

On July 23, 2021, Google (along with its codefendants ecobee and Vivint) served a third-party subpoena on Trane in the District Court action.  *Id.*, Ex. 9.[7]  The letter accompanying the subpoena made clear that it pertained to all three cases EcoFactor had filed in the Western District of Texas and enclosed the District Court protective order.  *Id.*, Ex. 9.  Trane produced documents in response to the subpoenas on September 20, 2021, including those discussed

---

[6] ITC -1185 was terminated in July 2021 after a finding of no violation of Section 337.

[7] Trane was also served with a subpoena in the ITC -1258 investigation on August 4, 2021.  *See Id.*, Ex. 10.

above: (1) Trane's ███████████████████████████████████████████, *id.*,

Ex. 1; and (2) the Trane presentation detailing ██████████████" referencing an

assumed ███████████, *id.*, Ex. 3 at 17.

The parties scheduled a deposition for William Yu, a representative of Trane, "pursuant

to [the] subpoenas in 337-1258 and in the Western District of Texas Matters" on October 4,

2021. *Id.*, Ex. 11. The deposition was conducted for purposes of the ITC investigation and the

District Court cases and was attended by counsel for Google and EcoFactor. *See, id.*, Ex. 12.

EcoFactor's counsel made no objection to the deposition being noticed and conducted for the

District Court case. *See id.* During the deposition, counsel for Google questioned Mr. Yu about

the documents Trane had produced in response to the subpoenas, and Mr. Yu authenticated those

documents, including those EcoFactor now inexplicably claims are not "in the record." *See id;*

Mot. at 9. Although EcoFactor was well aware that the Trane deposition would occur after the

deadline for its opening damages report, its counsel never requested an extension or permission

to serve a supplemental report in light of Mr. Yu's deposition. Porto Decl., Ex. 11.

### 2. EcoFactor had the Trane documents and used them to depose Mr. Schoettelkotte.

EcoFactor deposed Mr. Schoettelkotte on October 28, 2021 for purposes of its District

Court case against Google. During the deposition, counsel for EcoFactor had the Trane

documents and examined Mr. Schoettelkotte about them. Specifically, EcoFactor counsel

questioned Mr. Schoettelkotte about documents that Trane produced pursuant to the subpoenas,

marking the very same documents in his deposition it now challenges. *See* Porto Decl., Ex. 16 at

65:7-16; 72:21-73:25; 101:18-19; 102:1-3 (listing exhibits TRANE0000530, TRANE000084).

With respect to the Trane document ███████████████████████████████████

███████████████████ for example, EcoFactor's counsel examined Mr. Schoettelkotte

about the document, without noting any purported objection that the document had not been produced in the District Court case, as it now contends.  *See e.g.*, *id.* at 65:8-22 counsel for EcoFactor questioning as to "Exhibit 4, TRANE00000530").

EcoFactor's own damages expert, Mr. Kennedy, confirmed that he reviewed the Trane Agreement and discussed it with Mr. Habib as part of his analysis.  Porto Decl., Ex. 13 at 37:4-8; 178:16-18.  Mr. Kennedy, however, chose not to include or address the Trane patent license in his report because it was ██████████████████████████  He also testified that even if some value had been ██████████████████████████  his ████████████████████ ████████████████████  because the license was part of a ████████████████████ ██████████████████████████  *Id.* at 184:22-185:19.[8]

### 3.   The Trane documents were produced in discovery and used by EcoFactor, and EcoFactor cannot identify any prejudice.

EcoFactor argues that references to the documents produced by Trane should be stricken from Mr. Schoettelkotte's report because those documents are not "in the record" in this case. EcoFactor's argument should be rejected.  As an initial matter, there is no dispute that the Trane Agreement itself, to which EcoFactor's expert had access, was produced in this case.  *See* Mirzaie Decl., Ex. C (Trane Agreement), Porto Decl., Ex. 13 at 37:2-8, 178:16-18  (Mr. Kennedy testifying that he was aware of the Trane Agreement, reviewed it, and discussed it with Mr. Habib).  EcoFactor's complaints thus center on two documents related to the Trane Agreement:

---

[8] As noted above, although EcoFactor now complains that the Trane discovery was produced after it served Mr. Kennedy's report, EcoFactor was aware of the outstanding Trane subpoena and deposition when it served Mr. Kennedy's report and chose not to seek any extension. EcoFactor never requested a supplemental report to address the Trane documents, and even served a Revised "Corrected" opening damages report on November 1, 2021—four weeks after Mr. Yu's deposition—that again did not address any of the Trane documents about which EcoFactor now complains.  *See* Porto Decl., Ex. 14 (Revised Corrected Kennedy Report).

1770141

the Trane document ██████████████████████████████████████████████████

██████ (TRANE0000530)[9], and the Trane presentation referencing an ████████████████

███ (TRANE000084).[10]

    *First*, both documents were produced in this case pursuant to subpoenas that were served

in both the Western District and ITC matters.  In July, Google served a subpoena on Trane

(along with its codefendants) that specifically issued from this Court.  Porto Decl., Ex. 9.

Indeed, that letter enclosed the District Court Protective Order.  *Id.*  EcoFactor thus bases its

argument that Trane's responsive documents were produced in a different case on nothing more

than the subject line in Trane's production email.  But EcoFactor offers no explanation as to why

Trane would produce documents in only one ITC investigation after being subpoenaed in the

District Court case, too.  Furthermore, the parties went on to schedule a single deposition of a

Trane witness, explicitly referring to the "District Court and ITC matters," which EcoFactor did

not question.  *Id.* Ex. 11.[11]  And when the deposition was designated on the record for the

purposes of both the ITC -1258 and District Court matters, EcoFactor made no objection to the

deposition being conducted in the District Court cases.  *Id.* Ex. 12.  EcoFactor's argument is

particularly disingenuous in light of the parties' significant coordination among the ITC and

---

[9] Porto Decl., Ex. 1

[10] Porto Decl., Ex. 3. Notably, EcoFactor does *not* seek to strike Mr. Schoettelkotte's use of
TRANE000136, which was an EcoFactor-authored valuation of between ██████████████ for
its entire patent portfolio, and which Google obtained through Trane after EcoFactor failed to
produce it. *Compare* Porto Decl., Ex. 4 at ¶¶ 35, 108 (citing TRANE0000136) *with* EcoFactor
Mot. at 17 (seeking to strike ¶¶ 33, 85, 109, 121, 124, 125, 141, and certain portions of
paragraphs 175, 184-191).  To the extent TRANE0000136 is referenced in ████████ of the
paragraphs EcoFactor seeks to strike, there is no basis to strike this EcoFactor-authored
document from those paragraphs.

[11] Although EcoFactor objected that the deposition was untimely, it did not object to the
deposition being conducted for purposes of the District Court case.

District Court cases over the past year—including the fourteen depositions that were conducted for multiple matters, and the agreements in both cases specifying that the parties' documents produced in the ITC would be "deemed produced" in the District Court cases.  Porto Decl. Ex. 6; *See* ECF 70.  Perhaps most tellingly, EcoFactor never argues that it didn't actually possess the Trane documents since it indisputably did.  EcoFactor's *post hoc* attempt to manufacture a document production issue should be rejected.

*Second*, EcoFactor can articulate no prejudice because Mr. Kennedy made clear that he chose not address the Trane Agreement or related documents in his report because he considered them irrelevant.  Mr. Kennedy testified that he did not consider ███████" of the Trane Agreement because it was part of a ███████ Porto Decl., Ex. 13 at 184:13-18.  Furthermore, Mr. Kennedy testified that ████████████████████████ ███████████████████████████████████████.  *Id.* at 184:22-185:19.  Thus, even accepting EcoFactor's premise that the Trane documents were not produced in the District Court case, it has identified *no* prejudice, because its damages expert testified that he would not have addressed the Trane Agreement under any circumstance.  *See Wapp Tech Ltd. P'ship v. Seattle SpinCo, Inc.*, 2021 WL 414812, at *3 (E.D. Tex. Feb. 5, 2021) (refusing to exclude "untimely" documents where "[p]laintiffs do not specify how they will be prejudiced by these new documents").

The lack of prejudice to EcoFactor is confirmed by the fact that EcoFactor already used the documents to question Mr. Schoettelkotte during his deposition.  *See e.g.*, Porto Decl., Ex. 16 at 65:7-22.  What's more, EcoFactor chose not to seek an extension for its service of Mr. Kennedy's report despite knowing about the outstanding Trane deposition, and following the deposition, chose not to request that Mr. Kennedy be permitted to address the Trane discovery.

EcoFactor certainly could have done so; the parties had amicably agreed to extensions of deadlines in the past, including the deadlines for expert discovery. *See* ECF No. 102; *Gun Barrell Jacksonville LLC v. Depositors Ins. Co.*, 2021 WL 5154218, at *4 (E.D. Tex. Oct. 9, 2021) ("To the extent this changed testimony prejudiced [the defendant], the company could have moved for a continuance of the discovery deadline, sought to reopen [the witness's] deposition, or moved to amend its own expert reports. That it chose not to do so is not a basis to strike this portion of [the expert's] opinion."); *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 373 (5th Cir. 2016) (noting that the party's "failure to request an extension of the expert disclosure deadline does injure its argument" as to prejudice).

Finally, EcoFactor's argument that Google should have identified its expert's reliance on the Trane documents in an interrogatory response is also unpersuasive. Interrogatory No. 13, which EcoFactor identifies, asked Google to identify licensing policies, practices, agreements, and covenants-not-to-sue comparable to the hypothetical negotiation. *See* Mirzaie Decl., Ex. E. The two challenged Trane-produced documents—Trane's ███████ ████████████ ███████ and its ████████████████████—are not responsive to this interrogatory. EcoFactor doesn't argue that the Trane Agreement should be excluded under Rule 37 (nor could it, since EcoFactor itself produced it). But to the extent that EcoFactor faults Google for failing to identify the Trane Agreement in Google's response to Interrogatory No. 13, Google reasonably interpreted this request to seek information on ***Google's, not EcoFactor's*** ███████ ████████████████████████████████████ *Id.* (identifying Google-produced documents and objecting to the extent that request sought information not in Google's possession, custody or control). Unsurprisingly, EcoFactor cites no authority for the proposition

13

that a party must affirmatively disclose its expert's conclusions (especially those concerning

license agreements produced by the other party) in fact discovery.

### C. Mr. Schoettelkotte's reliance on EcoFactor's valuations is proper under Rule 702.

#### 1. EcoFactor procured several valuations prior to the hypothetical negotiation.

During the years prior to the hypothetical negotiation, EcoFactor had several valuations

performed to establish ███████████████████████████████████████████ defined as

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████         Mirzaie Decl, Ex. D at 3.  Such valuations, referred to as "409A

valuations," appraise "a company's shares of stock . . . to determine for tax purposes the value of

stock options."  *Blattman v. Siebel*, 2020 WL 475413, at *6 (D. Del. Jan. 29, 2020) (citing 26

U.S.C.A. § 409A).  A valuation in June 2017 valued EcoFactor at ██████████, and a valuation

in October 2020 valued EcoFactor at approximately ███████.  Porto Decl., Ex. 4 at Figure 1,

Ex. 15; Mirzaie Decl., Ex. D.

Along with other evidence, Mr. Schoettelkotte relied upon these EcoFactor valuations to

inform his reasonable royalty opinion.  Porto Decl., Ex. 4 at Figure 1.  In particular, Mr.

Schoettelkotte considered these valuations in his analysis of *Georgia Pacific* factors 8 and 11,

which relate to the commercial success of the patented product and the extent of the alleged

infringer's use of the product.  *See* Porto Decl., Ex. 4 ¶ 170.  Mr. Schoettelkotte noted that

"[g]iven that [these] valuations are based on EcoFactor's fair market value (which includes

intangible assets)," EcoFactor's 2017 and 2020 valuations suggest that "the value of EcoFactor's

patent portfolio could be no more than ███████████████████████ (in 2020)."  *Id.*

Within his analysis of factors 8 and 11, Mr. Schoettelkotte also relied on Google's sales data,

conversations with Google's finance personnel, Google's Form 10-Q, the smart thermostat market, and deposition testimony. *See id.* at ¶¶ 159-170. In rebutting the opinion of EcoFactor's expert, David Kennedy, Mr. Schoettelkotte noted that Mr. Kennedy had failed to consider this information. *Id.* ¶ 106.

## 2. EcoFactor's valuations are relevant to the value of EcoFactor's patents.

EcoFactor argues that a "valuation of a company as a whole is not an acceptable method of valuing that compan[y's] patents." Mot. at 8. There is no support for EcoFactor's position. EcoFactor cites *Mformation Techs., Inc. v. Rsch. in Motion Ltd*., 2012 WL 2339762 (N.D. Cal. June 7, 2012), where the court granted a patentee's motion *in limine* to exclude certain valuations from evidence. The court, however, explicitly permitted the expert to rely on valuations generally. *Id.* at *4. Indeed, the court noted that it did not "find any reason to limit the testimony of [the damages expert] due to the fact that she relied in part on these reports," noting that the valuations were "among the factors" considered in arriving at her ultimate damages opinion. *Id. Mformation* thus does not stand for EcoFactor's extreme position that a valuation is "not an acceptable method of valuing [a] company's patents," which warrants exclusion under *Daubert.* Mot. at 8. To the extent *Mformation* is relevant to *Daubert*, it suggests that reliance on valuations does *not* merit excluding an expert's opinions, particularly where the expert relies on the valuations as a single data point among many others, as Mr. Schoettelkotte does here. *See* Porto Decl., Ex. 4 ¶¶ 159-170 (considering along with valuations, sales data, conversations with finance personnel, financial reporting documents, market share data, and deposition transcripts).

A damages expert may rely upon corporate valuations to inform the hypothetical negotiation. In *Egenera, Inc. v. Cisco Sys., Inc*., -- F. Supp. 3d --, 2021 WL 2582406, at *13 (D. Mass. June 23, 2021), Cisco's damages expert used a valuation of Egenera "at the time the

alleged infringement began as the base for his royalty computation," excluding portions of the valuation "not attributable" to the patent in the hypothetical negotiation.  The *Egenera* court rejected the very argument that EcoFactor makes here, that somehow the value of the patents might be greater than the overall value of the company, and hence valuations should not be used "to cap the value of [the] patents."  Mot. at 9.  As the court explained, when a company makes and sells "products embodying the patent, the patent's value . . . [is] subsumed in the valuation of [the] company."  2021 WL 2582406, at *14.  A damages expert thus may "treat[] [the patentee's] valuation as the amount of money that someone purchasing the [company], including [the asserted patent], would have paid at the time of the infringement."  *Id.*  Thus, to the extent that EcoFactor quibbles with Mr. Schoettelkotte's reliance on these valuations, "[i]t is for the jury, with the benefit of rigorous cross-examination" to assess.  *Id.*

EcoFactor's suggestion that its valuations are otherwise unreliable is also unpersuasive.  EcoFactor's management relied upon these valuations for its tax filings with the IRS.  *See Blattman*, 2020 WL 475413, at *6 ("a 409A valuation is an appraisal . . . conducted to determine for tax purposes" pursuant to the Internal Revenue Code).  And EcoFactor cannot support its suggestion that the third-party valuators were somehow unaware of EcoFactor's intellectual property—in fact, the 2020 valuation specifically stated that EcoFactor was "currently pursuing infringement of its patents."  Mirzaie Decl., Ex. D at 6.  The valuator thus accounted for the fact that EcoFactor's business had shifted to patent assertion when assessing EcoFactor's value.

**D.     There is no basis for excluding Mr. Schoettelkotte's reliance on Google's usage data under Rule 702 or Rule 37.**

**1.     Mr. Schoettelkotte relied on data related to Nest thermostats' Internet connectivity to rebut EcoFactor's damages opinion.**

In rebutting Mr. Kennedy's damages opinion, Mr. Schoettelkotte noted that Mr. Kennedy failed to consider that not all of the accused products practice the accused features.  Porto Decl.,

Ex. 4 ¶ 71.  Mr. Schoettelkotte cited several pieces of evidence illustrating Mr. Kennedy's

oversight, including, for example, a survey and deposition testimony showing that only a small

percentage of Nest users participate in the programs through which Nest offers the accused

features.  *Id.* (citing NPS Survey, Desai deposition testimony).  As additional support, Mr.

Schoettelkotte cited a Google spreadsheet produced in connection with his report showing that

████████████████████████████████████████████████████  *Id.* (citing GOOG-ECOF-

WDTX-000001560, the "Wi-Fi spreadsheet").  Based on this evidence, Mr. Schoettelkotte

concluded that Mr. Kennedy had overstated the royalty base.  Mr. Schoettelkotte made no

calculations to adjust Mr. Kennedy's proposed royalty base as a result of the Wi-Fi spreadsheet

or other evidence.  Beyond relying on the Wi-Fi spreadsheet to rebut Mr. Kennedy's opinion,

Mr. Schoettelkotte did not otherwise rely upon or cite the document.

> **2.      Mr. Schoettelkotte's reliance on the Wi-Fi spreadsheet was reliable,
> and EcoFactor has identified no prejudice based on its lack of earlier
> access to the spreadsheet.**

EcoFactor asserts that the portions of Mr. Schoettelkotte's report referring to the Wi-Fi

Spreadsheet should be excluded both because the spreadsheet is unreliable, and because it was

not produced earlier in discovery.  Neither argument has merit.

*First*, EcoFactor argues that the Wi-Fi spreadsheet itself is unreliable, arguing that Mr.

Schoettelkotte "assumes, without evidence, that these figures [in the Wi-Fi spreadsheet] are

representative for accused products sold through other online sales channels."  Mot. at 14.  But

Mr. Schoettelkotte never states in his report or deposition testimony that the spreadsheet was

representative of other online sales channels, nor does EcoFactor provide a citation to support its

contention.  *See* Mot. at 14 (asserting without citation that Mr. Schoettelkotte assumes figures in

the Wi-Fi spreadsheet are representative).  By contrast, Mr. Schoettelkotte relies upon the Wi-Fi

spreadsheet for the uncontroversial proposition that not all Nest thermostats are connected to the

Internet.  *See* Porto Decl., Ex. 4 ¶ 71.  Mr. Schoettelkotte then uses the Wi-Fi spreadsheet as one

of several datapoints to show that Mr. Kennedy overstated the royalty base, without providing

any specific adjustment based on that spreadsheet (or other data).  EcoFactor thus has no support

for its argument that Mr. Schoettelkotte somehow inappropriately extrapolated from the Wi-Fi

Spreadsheet to EcoFactor's detriment.

 EcoFactor's attempts to use Mr. Schoettelkotte's deposition testimony to argue that the

Wi-Fi spreadsheet is unreliable fare no better.  Mr. Schoettelkotte testified that the Wi-Fi

spreadsheet identifies the number of users that were activated on a ███████████████████

██████ based on his conversations with Google personnel Manu Sharma.  Porto Decl., Ex. 16 at

34:2-14.  When EcoFactor's counsel questioned whether "███████████████████████

████████████████████████████████████" Mr. Schoettelkotte responded that the

question would be better answered by someone at Google.  *Id.* at 34:23-35:1. But Mr.

Schoettelkotte's knowledge of information outside of the document upon which he relies has no

bearing on whether the spreadsheet itself is reliable.

 *Second*, EcoFactor's argument that it was prejudiced by Google's production of the

spreadsheet with Google's rebuttal expert report lacks merit.  Mr. Schoettelkotte's opinion based

upon the spreadsheet was provided in ***rebuttal*** to an issue first raised in Mr. Kennedy's opinion.

Whether or how Mr. Kennedy would have addressed the Wi-Fi spreadsheet in his opening

damages report was not up to Google.  In any event, the Wi-Fi spreadsheet was but one of

multiple examples of the way in which Mr. Kennedy's royalty base had been overstated.  *See*

*Wapp Tech Ltd. P'ship*, 2021 WL 414812, at *3 (plaintiffs suffered "little prejudice" where

untimely documents were "cumulative" or "fill[ed] a gap in the record in a predictable

manner.").  And despite its argument that it would have sought to depose Mr. Sharma, EcoFactor

never sought an extension of discovery or any information about Mr. Sharma following Google's rebuttal report. *See Gun Barrell Jacksonville LLC*, 2021 WL 5154218, at *4 ("[T]he company could have moved for a continuance of the discovery deadline, sought to reopen [the witness's] deposition, or moved to amend its own expert reports. That it chose not to do so is not a basis to strike . . . [the expert's] opinion.").

Finally, EcoFactor suggests that Google should have produced this Wi-Fi spreadsheet in response to Interrogatory No. 13, but Interrogatory No. 13 is irrelevant to data about Nest users' Wi-Fi use; it asked for a description of ██████████████████████████████ ████████████████████████████████████ Mirzaie Decl., Ex. E (Interrogatory No. 13).  EcoFactor provides no basis for its assumption that users without Wi-Fi connections defy Nest's instructions in user manuals, nor does it otherwise explain why a spreadsheet reflecting aggregate Wi-Fi usage data would have been responsive to this interrogatory. *Wapp Tech Ltd.*, 2021 WL 414812, at *3 (no prejudice where "[t]here is no suggestion that Plaintiffs requested these documents and Defendants withheld them").  Because EcoFactor can identify no prejudice based on Google's production of the Wi-Fi spreadsheet with Google's rebuttal report, its argument should be rejected.

## III.    CONCLUSION

For the foregoing reasons, Google respectfully requests that EcoFactor's motion to exclude Mr. Schoettelkotte's testimony be denied in its entirety.

///

///

///

///

///

19

1770141

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated:  December 3, 2021

By: */s/ Jennifer A. Huber, with permission by*
     *Michael E. Jones*

Shamita Etienne-Cummings
(*admitted to the Western District of Texas*)
Allen & Overy LLP
1101 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 683-3810
GoogleEcofactorWDTX@AllenOvery.com

ROBERT A. VAN NEST
LEO L. LAM
JENNIFER A. HUBER
KRISTIN HUCEK
ANNA PORTO
PATRICK E. MURRAY
GREGORY WASHINGTON
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188
econest-kvp@keker.com

Bijal V. Vakil
(*admitted to the Western District of Texas*)
Eric Lancaster (admitted *Pro Hac Vice*)
Allen & Overy LLP
530 Lytton Avenue, 2nd Floor
Palo Alto, CA 94301
Telephone: (650) 388-1703
GoogleEcofactorWDTX@AllenOvery.com

POTTER MINTON
Michael E. Jones (TX Bar No. 10929400)
mikejones@potterminton.com
Patrick C. Clutter (TX Bar No. 24036374)
patrickclutter@potterminton.com
110 N. College, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-593-0846

Attorneys for Defendant GOOGLE LLC

1770141

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via electronic mail on December 3, 2021.

I also hereby certify that all counsel of record who have consented to electronic service are being served with a notice of filing of this document, under seal, pursuant to L.R. CV-5(a)(7) on December 3, 2021.

*/s/ Michael E. Jones*

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order in this case and Judge Albright's Standing Order Regarding Filing Documents Under Seal in patent Cases and Redacted Pleadings.

*/s/ Michael E. Jones*